UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRACEY L. KEVELIGHAN, KEVIN W.
KEVELIGHAN, JAMIE LEIGH
COMPTON, JAMIE LYNN COMPTON,
and KEVIN KLEINHANS,
       Plaintiffs,                                    Case No. 09-12543

v.                                            Honorable Patrick J. Duggan

TROTT & TROTT, P.C.; ORLANS
ASSOCIATES, P.C.; AMERICA'S
SERVICING COMPANY; DEUTSCHE
BANK NATIONAL TRUST COMPANY;
MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.;
WEBSTER BANK, N.A.; FANNIE MAE;
FIRST HORIZON HOME LOANS, aka
FIRST TENNESSEE BANK, N.A., aka
METLIFE HOME LOANS, aka FIRST
HORIZON ASSET SECURITIES, INC.;
BANK OF NEW YORK; U.S. BANK
HOME MORTGAGE; WELLS FARGO
HOME MORTGAGE, and HSBC
MORTGAGE CORP.,
       Defendants.
_____/

**OPINION AND ORDER**
At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on July 7, 2010.

PRESENT:       THE HONORABLE PATRICK J. DUGGAN
                         U.S. DISTRICT COURT JUDGE

On June 29, 2009, Tracey L. Kevelighan, Kevin W. Kevelighan, Jamie Lynn Compton,

Jamie Leigh Compton, and Kevin Kleinhans (collectively "plaintiffs") filed this purported

class-action lawsuit alleging various violations of federal and state law related to the

administration and enforcement of mortgage agreements.  On October 27, 2009, plaintiffs filed an amended complaint naming Trott & Trott, P.C. ("Trott"); Orlans Associates, P.C. ("Orlans"); America's Servicing Company ("ASC"); Deutsche Bank National Trust Company ("Deutsche Bank"); Mortgage Electronic Registration Systems, Inc. ("MERS"); Wells Fargo Home Mortgage ("Wells"); HSBC Mortgage Corporation ("HSBC"); Fannie Mae; First Horizon Home Loans ("First Horizon"); Bank of New York; and U.S. Bank Home Mortgage ("US Bank") as defendants.[1]  Since the filing of the amended complaint, MERS and HSBC have been dismissed based on plaintiffs' failure to obtain service on those defendants.  Presently pending before the Court are several motions to dismiss.  The motions have been fully briefed and the Court heard oral argument on April 22, 2010.

## I. Background

This lawsuit arises from various actions of the named defendants in administering mortgage and loan agreements with the named plaintiffs.  Primary issues in this case include whether defendants may collect attorney fees exceeding $37.50 after initiating but before completing foreclosure by advertisement proceedings and whether defendants may collect amounts advanced for property taxes by establishing post-advance escrow accounts with negative balances.  Other claims involve potential violations of disclosure and response requirements under various federal laws intended to protect homeowners and consumers.

In all the amended complaint alleges violations of the Real Estate Settlement

---

[1] Plaintiffs' original complaint also included Webster Bank, N.A., as a defendant. Webster Bank was not named in the amended pleadings and has been terminated from the case. Meanwhile, some allegations in the amended complaint refer to wrongful conduct by an entity named "Novasad," but Novasad is not named as a defendant.  (*See* Am. Compl. ¶ 484.)

Procedures Act ("RESPA"), 12 U.S.C.A. § 2601; violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C.A. § 1692; violations of the Truth in Lending Act ("TILA"), 15 U.S.C.A. § 1601; violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.A. § 1961; breaches of fiduciary duties; breaches of contract; tortious interference with contract; and other violations of Michigan common and statutory law. Plaintiffs' amended complaint contains 645 numbered paragraphs, spans 145 pages, and names 40 purported plaintiff and defendant sub-classes involved in this class action lawsuit. No classes have been certified at this time.

Presently pending before the Court are five separate motions to dismiss. In three of those motions, First Horizon, Deutsche Bank, and the Bank of New York seek dismissal on grounds that plaintiffs served them one day late. In the remaining two motions, US Bank, Wells, ASC, and Fannie Mae seek dismissal on the merits. Plaintiffs acknowledge that, should the Court deny the motions to dismiss based on untimely service, First Horizon, Deutsche Bank, and the Bank of New York would file motions to dismiss based on the same arguments presented in the two substantive motions. (Pls.' Resp. to First Horizon's Mot. to Dismiss at 5 n.1.) Furthermore, Trott and Orlans filed notices of joinder in the five pending motions. In short, three of the defendants seek dismissal for untimely service and all of the defendants seek dismissal on the merits of the case.[2]

## II. Lack of Proper Service

---

[2]Trott and Orlans included the three motions to dismiss based on untimely service in their joinder notices. On file with the Court, however, are certificates of service indicating that Trott and Orlans were served in a timely manner. (*See* docket nos. 11-12.) Absent further argument, therefore, the Court will not consider dismissing those parties for lack of proper service.

Federal Rule of Civil Procedure 4(m) provides, "If a defendant is not served within 120 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Where a plaintiff fails to effect timely service but "shows good cause for the failure, the court must extend the time for service for an appropriate period." *Id.* The determination of whether a plaintiff demonstrates good cause falls to this Court's discretion. *See Abel v. Harp*, 122 Fed. Appx. 248, 251 (6th Cir. 2005).

Plaintiffs filed their complaint on June 29, 2009, meaning that the 120-day period for service expired on October 27, 2009. Plaintiffs effected service on First Horizon, Deutsche Bank, and the Bank of New York on October 28, 2009. Relying on *Nafziger v. McDermott Int'l, Inc.*, 437 F.3d 514, 521 (6th Cir. 2006), First Horizon, Deutsche Bank, and the Bank of New York argue that plaintiffs lack good cause for their failure to serve within 120 days and, accordingly, that the Court must dismiss them from the case. In *Nafziger*, the plaintiffs failed to attempt service for more than six months after filing their complaint. 437 F.3d at 521.

In response to the motions to dismiss, plaintiffs' counsel in this case asserts that process servers attempted service on the moving defendants on October 27, 2009, and, after failing to effect service at that time, returned the next day with success. Plaintiffs' counsel asserts that the late attempts at service resulted from his desire to complete amendments to the complaint before effecting service. Plaintiffs' counsel also alleges that the moving defendants intentionally evaded service on October 27, 2009, and have not been prejudiced by the resulting one-day delay. As such, plaintiffs' counsel requests that, in the interests of

judicial economy,[3] the Court grant him a one-day extension for service and deny the motions to dismiss for insufficient service.

Having considered the relevant circumstances, the Court concludes that dismissal of First Horizon, Deutsche Bank, and the Bank of New York would only serve to needlessly delay the progress of this case. Although the Court believes that plaintiffs' counsel should have filed a motion for an extension of time to effect service and agrees that plaintiffs' counsel has not made the *best* showing of "good cause" for the delay, the Court fails to detect any bad faith or intentional neglect of the matter. Furthermore, the Court agrees that the moving defendants have not been prejudiced by the one-day delay and that dismissal without prejudice would only disrupt judicial economy. Given the attempt to serve the defendants before the expiration of the 120-day period, the Court grants plaintiffs a one-day extension and denies the motions to dismiss for insufficient service.

### III. Motions to Dismiss for Failure to State a Claim

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Supreme Court recently provided in *Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief

---

[3]Plaintiff's counsel asserts that, should the Court dismiss First Horizon, Deutsche Bank, and the Bank of New York without prejudice for insufficient service, he will simply re-file against those defendants and move to consolidate the new case with the present one, which would remain pending against the other defendants.

that is plausible on its face.'" *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 555, 570, 127 S. Ct. 1955, 1964-65 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Id.*; *see also Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007). This presumption, however, is not applicable to legal conclusions. *Iqbal*, 129 S. Ct. at 1949. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

In the context of claims that require proof of fraud, plaintiffs must meet an elevated standard of pleading. Federal Rule of Civil Procedure 9(b) provides, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The requirements of this particularity standard will be discussed in more detail when relevant to plaintiffs' claims.

## IV. Plaintiffs' Amended Complaint

To start, the Court notes that plaintiffs' amended complaint is long, repetitive, and difficult to comprehend. As previously noted, the amended complaint includes 634 paragraphs spanning 145 pages. In the substantive motions to dismiss pending before the Court, the defendants seek dismissal of the lawsuit in its entirety by presenting arguments against the claims they perceive to be alleged in the amended complaint. Plaintiffs provide a robotic response to the arguments presented without providing clarification of their claims.

Having read the amended complaint in its entirety, the Court believes that some of the arguments presented in the pending motions pertain to claims not actually alleged in the amended complaint and that other claims alleged in the amended complaint have been entirely overlooked. As noted above, motions to dismiss test the legal sufficiency of *complaints*. In resolving the present motions, the Court attempts to limit its analysis to claims actually alleged in the amended complaint.

## V. RESPA Claims

Plaintiffs' amended complaint appears to assert several claims pursuant to the RESPA.[4] Based on the arguments set forth in the substantive motion to dismiss by Wells, ASC, and Fannie Mae,[5] defendants seek dismissal of all asserted RESPA claims. Defendants specifically argue that some of the alleged RESPA violations fail to give rise to private rights of action, that plaintiffs misinterpret the "timely payments" requirement of the RESPA, and

---

[4]It is unclear whether many RESPA-related allegations in the amended complaint are intended to give rise to separate RESPA claims or merely to provide the grounds for other alleged claims. The Court addresses the RESPA allegations as both separate claims and grounds for other claims in an abundance of caution.

[5]The amended complaint does not appear to allege any RESPA claims against US Bank.

that the relevant defendants appropriately responded to a RESPA qualified written request by Tracey Kevelighan.

## A. Private Rights of Action under the RESPA

Defendants first argue that several of the RESPA violations alleged by plaintiffs fail to give rise to private rights of action. Throughout the pleadings in this case, plaintiffs make various allegations that defendants failed to comply with RESPA requirements regarding the use of escrow accounts. Many of these allegations, such as those concerning initial and annual account statements, refer to requirements set forth in 12 U.S.C.A. § 2609. That section of the RESPA, however, is not enforceable through private rights of action. *See Hardy v. Regions Mortg. Inc.*, 449 F.3d 1357, 1360 (11th Cir. 2006). Plaintiffs acknowledge as much in response to defendants' motion. (Pls.' Resp. to Mot. to Dismiss from Wells, ASC, and Fannie Mae at 6.) Therefore, any RESPA claim premised on 12 U.S.C.A. § 2609 is dismissed.

## B. The RESPA's "Timely Payments" Requirement

Having conceded that § 2609 claims fail, plaintiffs maintain that they have asserted a valid cause of action under the "timely payments" requirement codified at 12 U.S.C.A. § 2605(g). That section is enforceable by private action, *see* 12 U.S.C.A. § 2605(f), and provides:

> If the terms of any federally related mortgage loan require the borrower to make payments to the servicer of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall make payments from the escrow account for such taxes, insurance premiums, and other charges in a timely manner as such payments become due.

12 U.S.C.A. § 2605(g).  Plaintiffs specifically allege that defendants violated this section by attempting to collect funds previously advanced by the servicers for property taxes and insurance premiums by establishing new escrow accounts with negative balances.  Plaintiffs misconstrue the plain meaning of § 2605(g).

The "timely payments" requirement referred to by plaintiffs requires that servicers who collect funds from borrowers in order to pay taxes, insurance premiums, and other charges make those payments in a timely manner so as to avoid penalties thereon.  In other words, § 2605(g) governs when a servicer is required to pay taxes and insurance premiums on a mortgaged property where there has been no escrow waiver; it does not govern when the servicer can collect funds from the borrower for such payments.  The section of the RESPA that governs when, what, and how much a servicer may collect from a borrower for deposit in an escrow account is 12 U.S.C.A. § 2609 and, as discussed above, that section is not enforceable in the present lawsuit.

To the extent plaintiffs also seek to allege a "timely payments" violation based on the fact that, when the servicers in this case made advances for property taxes, penalties had already been incurred, they again fail to state a valid claim.  At the time the servicers intervened and paid delinquent property taxes on plaintiffs' properties, defendants were not requiring that plaintiffs make payments for deposit into escrow accounts.  For these reasons, the RESPA "timely payments" requirement is not relevant to this case and all such claims are dismissed.

## C. RESPA Response to a Qualified Written Request

Finally, Plaintiff Tracey Kevelighan alleges a separate RESPA claim that ASC and

Wells failed to appropriately respond to a qualified written request submitted on her behalf on April 24, 2009. The RESPA imposes certain response requirements on servicers of federally related mortgage loans who receive "qualified written requests" from borrowers for "information relating to the servicing of such loan[s]." 12 U.S.C.A. § 2605(e)(1)(A). Qualified written requests are written correspondences submitted by or on behalf of borrowers that allow servicers to identify the name and account of the borrower and include "a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." *Id.* § 2605(e)(1)(B).

In this case, plaintiffs' counsel sent a letter on behalf of Tracey Kevelighan on April 24, 2009, asserting his belief that defendants' conduct violates federal law, disputing the existence of a default on the specified mortgage loan, threatening litigation, demanding a reinstatement quote, and requesting various information under the heading "Qualified Written Request Under RESPA." (*See* Am. Compl. Ex. 13.) Plaintiffs' counsel specifically identified five pieces of information he was seeking under the RESPA. Plaintiffs allege that ASC and Wells failed to properly respond to these requests, but ASC and Wells maintain that a response sent on May 20, 2009, satisfied their obligations under the RESPA.

After receiving a qualified written request, a servicer has 20 days (excluding legal public holidays, Saturdays, and Sundays) within which to either acknowledge receipt of the correspondence or take the requested action. 12 U.S.C.A. § 2605(e)(1)(A). Under the former option, the servicer then has a total of 60 days from receipt of the correspondence (again excluding legal public holidays, Saturdays, and Sundays) within which the servicer must

further respond in at least one of three ways: (1) "make appropriate corrections in the account of the borrower . . . and transmit to the borrower a written notification of such correction . . . ;" (2) "after conducting an investigation, provide the borrower with a written explanation or clarification . . . of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer;" or (3) "after conducting an investigation, provide the borrower with a written explanation or clarification that includes [] information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer . . . ."[6]  *Id.* § 2605(e)(2).

On May 20, 2009, ASC sent a letter to plaintiffs' counsel indicating receipt of the April 24, 2009, correspondence.[7]  The letter went on to explain that the matter had been researched and provided information regarding ASC's purchase of temporary insurance coverage after discovering that homeowner's insurance on the subject property had been canceled.[8]  (*See* Am. Compl. Ex. 14.)  While this letter arguably provided a partial response to plaintiffs' counsel's request for "itemization of all Lender Advances made in connection to this mortgage loan," it failed entirely to address or even acknowledge the other four requests for information.  Even so, ASC and Wells maintain that the letter satisfied all of their obligations under the RESPA.

The Court concludes that plaintiffs have sufficiently alleged a RESPA violation on this

---

[6]Under all three options, the servicer must also provide contact information for the borrower to obtain assistance.

[7]May 20, 2009, fell within 20 days of April 24, 2009, excluding intervening weekends.

[8]The letter also provided a phone number and hours of business for ASC's Customer Relations Department.

issue to survive the pending motions to dismiss. Without citing any authority, ASC and Wells assert that they are not required to provide a "point by point response to a legal letter." (Reply to Mot. to Dismiss from Wells, ASC, and Fannie Mae at 2.) Even if the RESPA does not require that ASC and Wells respond to the entirety of the April 24, 2009, letter, it appears to require that they at least address the five specific requests made under the RESPA. Therefore, the Court denies the motions to dismiss to the extent they seek dismissal of Tracey Kevelighan's RESPA claim alleging violation of 12 U.S.C.A. § 2605(e).

## VI. FDCPA Claims

Plaintiffs allege that defendants violated the FDCPA in several different ways. Defendants seek dismissal of all FDCPA claims on grounds that such claims are barred by the applicable statute of limitations, that the FDCPA does not apply to the actors in this case, and that the FDCPA does not prohibit the conduct in this case.

## A. Statute of Limitations

Actions brought pursuant to the FDCPA are subject to a one-year statute of limitation. 15 U.S.C.A. § 1692k(d). In its separate motion, US Bank asserts that any FDCPA claims alleged against it are time-barred. Plaintiffs admit as much in their amended complaint. (Am. Compl. ¶ 261.) As such, all FDCPA claims against US Bank are dismissed.

Wells, ASC, and Fannie Mae similarly allege, albeit in a footnote, that "[t]he one year statute of limitations under the FDCPA provides additional grounds for dismissal." (Mot. to Dismiss from Wells, ASC, and Fannie Mae at 12 n.9.) These defendants failed, however, to provide support for their allegation. Unlike the situation with US Bank, plaintiffs do not admit in their amended complaint that their claims against Wells, ASC, and Fannie Mae are

time-barred.  Furthermore, it appears from the amended complaint that some, if not all, of the

allegedly unlawful conduct by these defendants occurred within the year preceding the filing

of plaintiffs' complaint.  Therefore, the motion to dismiss is denied as to this ground.[9]

## B. FDCPA Debt Collectors

Next, defendants assert that the FDCPA does not govern their conduct because they are

not "debt collectors" as that term is contemplated by the act.  Under the FDCPA, "debt

collector" refers to "any person who uses any instrumentality of interstate commerce or the

mails in any business the principal purpose of which is the collection of any debts, or who

regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted

to be owed or due another."  15 U.S.C.A. § 1692a(6).  This definition does not include a

creditor—"any person who offers or extends credit creating a debt or to whom a debt is

owed"—or "any person collecting or attempting to collect any debt owed or due or asserted

to be owed or due another to the extent such activity . . . concerns a debt which was not in

default at the time it was obtained by such person . . . ."  15 U.S.C.A. § 1692a(4), (6)(F); *see

also Montgomery v. Huntington Bank*, 346 F.3d 693, 698-99 (6th Cir. 2003).

Based on these definitions, courts have concluded that mortgagees and mortgage

servicing companies "are not debt collectors and are statutorily exempt from liability under

the FDCPA."  *Scott v. Wells Fargo Home Mortg. Inc.*, 326 F. Supp. 2d 709, 718 (E.D. Va.

2003).  Specifically, mortgagees are viewed as exempt from the FDCPA as "creditors" and

mortgage servicing companies are not considered debt collectors under the act so long as "the

---

[9]To the extent that other defendants simply joined in the pending motions, they too failed
to support any claim that the statute of limitations bars plaintiffs FDCPA claims.

borrower was not in default at the time the servicer acquired its interest in the loans." *King v. Ocwen*, No. 07-11359, 2009 WL 724062, *4-5 (E.D. Mich. March 18, 2009). A creditor may be viewed as a debt collector, however, if, "in the process of collecting his own debts, [the creditor] uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C.A. § 1692a(6).

In this case, the holders of the underlying mortgage notes—Deutsche Bank, Fannie Mae, and the Bank of New York—argue that they are not subject to the FDCPA because they are creditors, rather than debt collectors, under the act. *See King*, 2009 WL 724062 at *5. Plaintiffs allege, however, that these defendants used names other than their own in the process of collecting their debts. (*See, e.g.*, Am. Compl. ¶ 331, 337-39.) For purposes of the present motions, then, the amended complaint sets forth facts sufficient to allege the debt collector status of the mortgage holders so as to bring their collection activities within the reach of the FDCPA.[10] *See Carlson v. Long Island Jewish Med. Ctr.*, 378 F. Supp. 2d 128, 132-33 (E.D.N.Y. 2005).

The mortgage servicing companies in this case—Wells, ASC, and First Horizon—also seek dismissal on grounds that they are not debt collectors under the FDCPA. *See King*, 2009 WL 724062 at *4. On the most basic level, plaintiffs oppose dismissal of the servicers on this ground because mortgage servicing companies, by the nature of their business,

---

[10]The mortgage holders alternatively argue that they are exempt from the FDCPA because they took no action to enforce the underlying debts—collection was pursued by the respective servicers rather than the mortgage holders. True or not, plaintiffs have sufficiently alleged the mortgage holders' involvement in collection efforts to survive the pending motions to dismiss.

regularly collect or attempt to collect "debts owed or due or asserted to be owed or due another." 15 U.S.C.A. § 1692a(6). This argument overlooks, however, the exemption for "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person . . . ." 15 U.S.C.A. § 1692a(4), (6)(F). As previously explained, this provision has been construed so as to exempt mortgage servicing companies from the FDCPA so long as "the borrower was not in default at the time the servicer acquired its interest in the loans."[11] *King*, 2009 WL 724062 at *4.

To overcome this exemption, plaintiffs also allege that the servicers attempted to collect payments for "additional debt" under the mortgage agreements that was "in default at the time it was obtained." (Pls.' Resp. to Mot. to Dismiss from Wells, ASC, and Fannie Mae at 13.) There is no question, however, that the underlying mortgage debts were not in default at the time the respective servicers began collection attempts and that the "additional debt" referred to by plaintiffs had yet to even accrue when servicing began. Because the collection of "fees which arise by way of an underlying debt are viewed as part of that debt for purposes of determining conduct that falls under the statute," *Volden v. Innovative Fin. Sys., Inc.*, 440 F.3d 947, 951 (8th Cir. 2006), the servicers' attempts to collect "additional debts" arising from the underlying mortgages does not remove the servicers from the exemption, even if

_____

[11]Without citation to any legal authority, plaintiffs maintain that the exemption for debts not in default applies only to the recipients of assignments. Because the provision has regularly been applied to mere servicers (as opposed to assignees), the Court rejects plaintiffs' argument. Furthermore, the Court notes that, if an assignment is made, the debt is not longer "owed or due another" as contemplated by the exemption.

they ultimately attempted to collect "additional debts" that had gone into default.

Finally, plaintiffs oppose dismissal of the servicers on grounds that, like the mortgage holders, they too used names other than their own in collecting the debts. (Pls.' Resp. to Mot. to Dismiss from Wells, ASC, and Fannie Mae at 13-14.) The Court, however, has been unable to find such allegations in the amended complaint. Therefore, all FDCPA claims alleged against the servicer defendants—Wells, ASC, and First Horizon—are dismissed.[12]

## C. Alleged Conduct in Violation of the FDCPA

Even if some of the defendants qualify as debt collectors, they argue that they are entitled to dismissal on the merits of plaintiffs' claims. Specifically, defendants assert that the conduct forming the foundation of plaintiffs' FDCPA claims is not prohibited by the FDCPA. Plaintiffs allege that defendants violated the FDCPA in several different ways: by failing to administer escrow accounts as required by the RESPA, by collecting attorney fees in violation of state law, and by using escrow accounts to collect previously advanced property taxes in breach of the underlying mortgage agreements. These allegations give rise to two potential FDCPA claims.

### 1. RESPA Violations as FDCPA Violations

In arguing that defendants violated the FDCPA, plaintiffs reiterate their allegations that defendants violated the RESPA by, among other things, failing to provide initial analyses and

---

[12]By filing notices of joinder in the motion to dismiss by Wells, ASC, and Fannie Mae, it would seem that the defendant law firms in this case—Trott and Orlans—also seek dismissal on grounds that they are not "debt collectors" under the FDCPA. Law firms, however, play an entirely different role in the enforcement and administration of mortgage agreements than creditors and servicers. Without a separate analysis or explanation of why they should not be considered debt collectors, then, the Court concludes that Trott and Orlans have failed to sufficiently support any claim for dismissal on this basis.

account statements for escrow accounts.  As discussed above, these allegations refer to 12 U.S.C.A. § 2609, which provides no private right of action for its enforcement.  *See supra* Section IV.A.  Plaintiffs cannot avoid this fact by merely alleging RESPA violations as FDCPA violations.  To the extent plaintiffs' FDCPA claims arise under 12 U.S.C.A. § 2609, then, those claims are dismissed.

**2. Collection of Attorney Fees**

Plaintiffs next argue that defendants violated the FDCPA by collecting attorney fees in excess of the amount allowed by state law.  The FDCPA prohibits debt collectors from using "unfair or unconscionable means to collect or attempt to collect any debt."  15 U.S.C.A. § 1692f.  Violative conduct includes, among other things, "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."  *Id.* § 1692f(1).  Plaintiffs specifically allege that, after commencing foreclosure by advertisement and as a condition to reinstatement, defendants required payment of attorney fees in excess of the amount allowed by Michigan statute.  Plaintiffs argue that such conduct violates the FDCPA.

Michigan law limits the recovery of attorney fees in foreclosures by advertisement as follows:

> Where an attorney is employed to foreclose a mortgage by advertisement, an attorney's fee, not to exceed any amount which may be provided for in the mortgage, may be included as part of the expenses in the amount bid upon such sale for principal and interest due thereon in the following amounts:
>> (a) for all sums of $1,000.00 or less, $25.00.
>> (b) for all sums over $1,000.00 but less than $5,000.00, $50.00.

(c) for all sums of $5,000.00 or more, $75.00.
But if payment is made after foreclosure proceedings are commenced
and before sale is made, only ½ of such attorney's fees shall be allowed.

Mich. Comp. Laws Ann. § 600.2431(2). In each of the underlying mortgages in this case,

defendants began foreclosure by advertisement but the respective plaintiffs either reinstated

or sought to reinstate before sale was made. In such circumstances, plaintiffs assert that

Michigan law limits recovery of attorney fees to $37.50.[13] Relying on contractual provisions

in the mortgage agreements, however, defendants charged the respective plaintiffs

"reasonable attorney fees" as a condition to reinstatement.[14] (*See, e.g.*, Am. Comp. Ex. 21

§ 19 ("If Borrower meets certain conditions, Borrower shall have the right to have

enforcement of his Security Instrument discontinued . . . . Those conditions are that

Borrower: . . . pays all expenses incurred in enforcing this Security Instrument, including,

but not limited to, reasonable attorneys' fees . . . .").)

In seeking dismissal of plaintiffs' FDCPA claims, defendants contend that the express

mortgage provisions allowing recovery of reasonable attorney fees as a condition to

reinstatement justify their conduct and trump the Michigan statute relied on by plaintiffs.

Although the FDCPA generally allows collection of amounts "expressly authorized by the

agreement[s] creating the debt," 15 U.S.C.A. § 1692f(1), an attempt to collect an amount

prohibited by law (but nonetheless expressly authorized by an agreement) gives rise to a

cognizable FDCPA claim. *See Barany-Snyder v. Weiner*, 539 F.3d 327, 332, 336 (6th Cir.

---

[13]There is no dispute that each of the underlying mortgages exceed $5,000.00.

[14]The amounts charged as "reasonable attorney fees" significantly exceeded $37.50.
(*See, e.g.*, Am. Compl. Ex. 15).

2008) (dismissing similar claims but only because the defendant never actually attempted to collect the attorney fees); *see also* 15 U.S.C.A. § 1692f (prohibiting all "unfair or unconscionable means" of collecting debts). Therefore, the viability of plaintiffs' claims depends on whether Michigan law actually prohibits attorney fees exceeding the amount set forth in the aforementioned statute.

As to this issue, defendants assert that reasonable attorney fees are collectible under Michigan law when expressly authorized by mortgage agreements. As an extension of this claim, defendants maintain that the statute noted above applies only when a mortgage agreement is silent with respect to the collection of attorney fees. In support of these arguments, defendants rely on two cases that enforced reasonable attorney fees provisions in underlying mortgage agreements. *See United Growth Corp. v. Kelly Mortg. & Inv. Co.*, 86 Mich. App. 82, 89-90, 272 N.W.2d 340, 344 (1978); *Butzel v. Webster Apartments Co.*, 112 F.2d 362, 365 (6th Cir. 1940). Plaintiffs properly note, however, that these cases involved foreclosure by lawsuit. *See United Growth*, 86 Mich. App. at 84, 272 N.W.2d at 342; *Butzel*, 112 F.2d at 364. The statute noted above applies by its terms only to foreclosure by advertisement. Mich. Comp. Laws Ann. § 600.2431. It is not surprising, then, that the cases cited by defendants failed to acknowledge the limitations imposed by the statute.

Defendants do point, however, to a third case that appears to adopt their understanding of Michigan law on attorney fees in foreclosure by advertisement. In *in re Alden*, the bankruptcy court in this district sought to reconcile a mortgage agreement authorizing the collection of "the attorneys' fees provided for by statute" and § 600.2431. 123 B.R. 563, 564 (Bankr. E.D. Mich. 1990). Because the mortgage agreement in that case limited recovery to

the amount provided by statute, the bankruptcy court ultimately awarded only $37.50 in attorney fees to the bank. *Id.* at 568. In arriving at that conclusion, however, the bankruptcy court unnecessarily implied that a mortgage agreement authorizing recovery of "reasonable" attorney fees, rather than those provided for by statute, would justify an award of fees exceeding the amounts set forth in § 600.2431. *Id.* at 565

This Court is neither bound nor persuaded by the suggestion in *Alden* that attorney fees may exceed the amounts set forth in § 600.2431 so long as the underlying mortgage agreement authorizes recovery of "reasonable" attorney fees. The statute itself explicitly identifies when parties may independently negotiate a different amount for attorney fees and that is when the parties want to agree to an amount below that provided in the statute. *See* Mich. Comp. Laws Ann. § 600.2431(2) ("Where an attorney is employed to foreclose a mortgage by advertisement, an attorney's fee, not to exceed any amount which may be provided for in the mortgage, may be included as part of the expenses . . . ."). The Michigan legislature could just have easily included an exception for agreements exceeding the amounts provided in the statute but did not. As written, then, the plain language sets a statutory maximum for the collection of attorney fees in foreclosure by advertisement.[15] Therefore the Court concludes that plaintiffs sufficiently allege unfair debt collection practices when they assert that defendants attempted to collect attorney fees in excess of the amounts allowed under Michigan law.

---

[15]In *Alden*, the bankruptcy court acknowledged that § 600.2431 "establishes a statutory maximum," but then limited the application of that maximum to "nonconsensual" attorney fees. 123 B.R. at 565. The Court has been unable to discern support for that limitation in the statute or Michigan case law.

### 3. Use of Escrow Accounts to Collect Previously Advanced Property Taxes

Finally, plaintiffs appear to allege that defendants have engaged in unfair debt collection practices by attempting to collect funds advanced for property taxes and homeowner's insurance by billing them as "escrow items" rather than as "additional debt" as provided for by the underlying mortgage agreements.[16]  Plaintiffs allege that the intended consequence of this conduct is to allow defendants to collect immediate repayment for the advanced funds rather than to wait to recoup the advances until the end of the mortgage term. To the extent such conduct actually breaches the underlying mortgage agreements, it may give rise to a cognizable FDCPA claim as an unfair debt collection practice.

In the underlying mortgages in this case, defendants executed "escrow waivers," meaning that plaintiffs were responsible for paying for items such as property taxes and homeowner's insurance ("escrow items") directly.  In the event plaintiffs failed to make such payments, however, the mortgage agreements permit the defendants to pay the amounts and then seek repayment from plaintiffs.  Specifically, the mortgage agreements provide:

> If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount.

(Am. Compl. Ex. 21 § 3.)[17]  Section 9 then states: "Any amounts disbursed by Lender under

---

[16]It is unclear to the Court whether these allegations are intended to support a FDCPA claim or a RESPA claim.  To the extent the allegations may assert a RESPA claim, however, the allegations again implicate 12 U.S.C.A. § 2609, which provides no private right of action.

[17]The quoted provision is characteristic of all the mortgage agreements involved in this case.

this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment." (Am. Compl. Ex. 21 § 9.)

Plaintiffs acknowledge that defendants advanced funds for escrow items and are entitled to seek repayment, with interest, for those advances. Plaintiffs maintain, however, that by categorizing the advancements as "additional debts" and making them only "payable" upon notice (as opposed to "due" or "collectable"), the mortgage agreements do not allow defendants to require repayment before the end of the mortgage term. This construction of the underlying mortgage agreements would also limit the manner in which payments by plaintiffs could be applied to the outstanding obligations under the note and prohibit defendants from declaring a "default" for mere failure to repay advancements on demand.

The Court concludes that plaintiffs' allegations are sufficient to survive the pending motions to dismiss. In defining the term "payable," Black's Law Dictionary notes, "An amount may be payable without being due. Debts are commonly payable long before they fall due." *Black's Law Dictionary* (8th ed. 2004). Under the terms of the mortgage agreements, then, plaintiffs had the right to repay the advances upon defendants' requests, but were not required to do so until the debt secured by the note matured.[18] Upon review the Court has been unable to identify any mortgage provision that would allow defendants to accelerate repayment on the advances independent of the remainder of the debt. Therefore,

---

[18]Plaintiffs might have chosen to repay earlier rather than later to avoid the additional accrual of interest on the advancements.

to the extent that defendants attempted to collect immediate repayment of the advances, applied plaintiffs' principal payments to repayment of advances not yet due, and used plaintiffs' failures to make repayment of the advances as grounds for declaring default, defendants may have engaged in unfair debt collection practices. Defendants' motion to dismiss is therefore denied as to this claim.

## VII. RICO Claims

Defendants next seek dismissal of plaintiffs' RICO claims. Plaintiffs allege that the conduct giving rise to the FDCPA claims also gives rise to civil RICO claims. To succeed on these claims, plaintiffs must establish "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S. Ct. 3275, 3285 (1985). "To satisfy the enterprise requirement, an association-in-fact must be an ongoing organization, its members must function as a continuing unit, and it must be separate from the pattern of racketeering activity in which it engages." *Frank v. D'Ambrosi*, 4 F.3d 1378, 1387 (6th Cir.1993). "Racketeering activity" includes, among other things, "any act which is indictable under . . . [18 U.S.C.A.] section 1341 (relating to mail fraud)" and a "pattern" of racketeering activity "requires at least two acts of racketeering activity . . . which occurred within ten years . . . ." 18 U.S.C.A. § 1961(1), (5).

To survive the pending motions to dismiss, plaintiffs' RICO claims must be alleged with sufficient detail to set forth each RICO element and, because Plaintiff alleges predicate acts of mail fraud, to satisfy the heightened pleading requirements of Rule 9 of the Federal Rules of Civil Procedure. *See Vennittilli v. Primerica, Inc.*, 943 F. Supp. 793, 799 (E.D. Mich. 1996) (quoting *Jepson Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994)). This

requires that plaintiffs provide an adequately detailed description of the predicate acts of mail fraud; indicate which defendants are responsible for which acts of fraud; and identify the time, place, and misrepresentations giving rise to the fraud. *Id.* It is insufficient, though, to transmute claims sounding in contract "into RICO claims by simply appending the terms 'false' and 'fraudulent.'" *Kolar v. Preferred Real Estate Invs., Inc.*, No. 08-3119, 361 F. App'x 354, 363-64 (3d Cir. Jan. 12, 2010); *see also Blount Fin. Servs. Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 152-53 (6th Cir. 1987) ("Sending a financial statement which misconstrues the prime rate provided by the terms of the contract may breach the contract but it does not amount to a RICO mail fraud cause of action.").

Having reviewed the amended complaint, the Court concludes that plaintiffs fail to allege viable RICO claims. Plaintiffs allege that the various defendants formed enterprises, memorialized by "Pooling and Servicing Agreements," to administer and enforce mortgage agreements. (*See, e.g.*, Am. Compl. ¶¶ 396-99.) These enterprises then allegedly engaged in mail fraud by sending billing notices that attempted to collect excessive attorney fees and/or repayment of advances not yet due. (*Id.*) In each of the alleged enterprises, it is further alleged that the mortgage holders directed the conduct of the servicers who, in turn, mailed the "fraudulent" demands to plaintiffs. (*See, e.g., id.* ¶ 400.) The underlying "fraud" allegations, though sufficient to support claims under the FDCPA,[19] primarily sound in contract. The parties simply dispute, under the relevant mortgage terms, the amount of

---

[19]The Court notes that the FDCPA, by its terms, incorporates claims that generally sound in contract by prohibiting "[t]he collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is *expressly authorized by the agreement creating the debt* or permitted by law." 15 U.S.C.A. § 1692f(1) (emphasis added).

attorney fees that can be charged and when repayment of advancements become due. Plaintiffs cannot transform these claims into RICO claims by merely alleging that the purported attempts to breach the mortgage terms were done "fraudulently." *See Blount Fin. Servs.*, 819 F.2d at 152-53; *Kolar*, 361 F. App'x at 363-64. The Court therefore dismisses all of plaintiffs' RICO claims.

## VII. State Law Claims

In conjunction with their RESPA, FDCPA, and RICO claims, plaintiffs' allege numerous state law claims. These claims present separate theories of recovery based on the same conduct forming the grounds for the federal claims analyzed above. The Court analyzes each state law claim in turn.

### A. Michigan Secondary Mortgage Loan Act

Citing a single provision thereof, plaintiffs allege that defendants' violated the Michigan Secondary Mortgage Loan Act ("SMLA") by violating the FDCPA. *See* Mich. Comp. Laws Ann. § 493.75. Plaintiffs take that single provision out of context. The SMLA governs conduct related to "secondary mortgage loans," loans secured by mortgages on properties already subject to a liens of one or more prior mortgages. *Id.* § 493.51(*o*). None of the underlying mortgages in this case are secondary mortgages. Therefore, the statute does not apply to the present case and plaintiffs' SMLA claims are dismissed.

### B. Attorney Fees for Foreclosure by Advertisement

Defendants argue that they are entitled to the dismissal of claims alleging violations of Michigan's statute governing the collection of attorney fees in foreclosure by advertisement. *See* Mich. Comp. Laws Ann. § 600.2431. Although this statute is relevant to plaintiffs'

FDCPA claim that defendants engaged in unfair debt collection practices by attempting to collect excessive attorney fees, there is no separate and independent claim in the amended complaint based solely on this statute.

## C. Tortious Interference with Contract

Turning to Michigan common law, plaintiffs allege that defendants tortiously interfered with contracts. A tortious interference claim exists where there is "(1) a contract, (2) a breach, and (3) an unjustified instigation of the breach by the defendant." *Mahrle v. Danke*, 216 Mich. App. 343, 350, 549 N.W.2d 56, 60 (1996). Such claims, however, cannot be brought against a party to the contract or an agent of a party to the contract. *See Reed v. Mich. Metro Girl Scout Council*, 201 Mich. App. 10, 13, 506 N.W.2d 231, 233 (1993). In this case all defendants are either contracting parties or agents to contracting parties. The Court rejects plaintiffs' unsupported attempts to distinguish between individual and agency "hats" worn by some of the defendants. Plaintiffs' tortious interference with contract claims are therefore dismissed.

## D. Breach of Fiduciary Duties

Plaintiffs next allege that they had fiduciary relationships with defendants and that defendants breached their fiduciary duties when they violated the FDCPA. Under Michigan law, "a fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another." *Teadt v. Lutheran Church Missouri Synod*, 237 Mich. App. 567, 580-81, 603 N.W.2d 816, 823 (1999). Generally, no fiduciary duties arise within the lender-borrower context. *Farm Credit Servs. of Mich.'s Heartland, P.C.A. v. Weldon*, 232 Mich. App. 662, 680, 591 N.W.2d 438, 447 (1999).

Plaintiffs argue that the underlying mortgage agreements created fiduciary duties for defendants by giving defendants discretion with respect to exercising their rights under a power of sale, collecting funds through escrow agreements, and charging "reasonable" attorney fees. Specifically, plaintiffs assert that "[i]ntermingled within each of these given rights is a level of trust that the Lender will exercise these powers reasonably, fairly, and in accordance with applicable law." (Pls.' Resp. to Mot. to Dismiss by US Bank at 15.)

The trust required by the underlying mortgage agreements is nothing more than is inherent in most contracts. At the executory stage of every contract, each party must, to a certain extent, trust the other to carry out his or her performance in compliance with the contract and the law. To the extent that any party breaches a contract or violates the law during performance, the other party may typically attempt to recover in a civil action for the alleged breach or violation, as plaintiffs are doing here. This does not mean that every contract gives rise to fiduciary duties amongst the parties.

While the mortgage agreements in this case provide defendants some discretion in exercising their rights, they do not require that plaintiffs rely on defendants' judgment or advice in making their own decisions. On these facts, there is no reason to stray from the general rule that no fiduciary duties arise in the lender-borrower context and plaintiffs fiduciary duty claims are dismissed.

**E. Breach of Contract**

Given the preceding analysis, it is not surprising that plaintiffs also allege breach of contract claims. Specifically, plaintiffs assert that defendants breached the underlying mortgage agreements by charging attorney fees in excess of Michigan's statutory maximum.

Although the mortgage agreements did not specifically cite Mich. Comp. Laws Ann. § 600.2431, plaintiffs maintain that charging amounts in excess of state law is necessarily unreasonable in breach of the contract terms. On these allegations and for the reasons set forth in Section V.C.2, *supra*, the Court denies the motions to dismiss as to the breach of contract claims.

Plaintiffs' amended complaint also sets forth breach of contract claims based on the demands for immediate repayment of funds advanced for taxes. For the reasons set forth in Section VI.C.3, *supra*, the Court concludes that plaintiffs sufficiently allege breaches of the mortgage agreements for those claims to survive the pending motions to dismiss.

## F. Conspiracy

Finally, plaintiffs allege that, in violating the FDCPA, defendants engaged in civil conspiracies. Under Michigan law, a "[c]ivil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Temborius v. Slatkin*, 157 Mich. App. 587, 599-600, 403 N.W.2d 821, 827-28 (1986). To succeed on a claim for civil conspiracy, there must be an underlying actionable tort. *The Mable Cleary Trust v. The Edward-Marlah Muzyl Trust*, 262 Mich. App. 485, 507, 686 N.W.2d 770, 786 (2004). As explained in Section VII, *supra*, however, plaintiffs' civil conspiracy claims—like the RICO claims—are based on allegations sounding in contract. Therefore, the Court grants defendants' motions to dismiss the civil conspiracy claims.

## VII. Conclusion

To expedite the progress of this litigation, the Court denies the motions to dismiss

based on untimely service. As to the substantive motions to dismiss, the Court concludes that only some of plaintiffs' claims are subject to dismissal. Therefore, for the reasons set forth above,

**IT IS ORDERED** that the time for service is extended to **OCTOBER 28, 2009**.

**IT IS FURTHER ORDERED** that First Horizon's Motion to Dismiss is **DENIED**.

**IT IS FURTHER ORDERED** that Deutsche Bank's Motion to Dismiss is **DENIED**.

**IT IS FURTHER ORDERED** that Bank of New York's Motion to Dismiss is **DENIED**.

**IT IS FURTHER ORDERED** that the motion to dismiss by US Bank is **GRANTED IN PART AND DENIED IN PART** as follows:

The motion is **GRANTED** as to Plaintiffs' FDCPA, RICO, SMLA, tortious interference with contract, breach of fiduciary duty, and civil conspiracy claims. Those claims are therefore **DISMISSED** as to US Bank.

The motion is **DENIED** as to Plaintiffs' breach of contract claim.

**IT IS FURTHER ORDERED** that the motion to dismiss by Wells, ASC, and Fannie Mae is **GRANTED IN PART AND DENIED IN PART** as follows:

The motion is **GRANTED** such that Plaintiffs' RESPA claims based on 12 U.S.C.A. § 2605(g) ("timely payments" requirement) and §2609 (administration of escrow accounts) are **DISMISSED** as to all defendants.

The motion is **DENIED** as to Tracey Kevelighan's claim against Wells and ASC alleging that they failed to properly respond to a RESPA qualified written

request.

The motion is **GRANTED** such that Plaintiffs' FDCPA claims against Wells, ASC, and First Horizon are **DISMISSED** because these mortgage servicers do not qualify as "debt collectors" under the FDCPA.

The motion is **DENIED** as to Plaintiffs' FDCPA claims against Deutsche Bank, Fannie Mae, the Bank of New York, Trott, and Orlans alleging unfair debt collection practices based on the collection of excessive attorney fees and demands for immediate repayment of advanced funds.

The motion is **GRANTED** such that Plaintiffs' FDCPA claims alleging violations of § 2609 of the RESPA are **DISMISSED** as to all defendants.

The motion is **GRANTED** such that Plaintiffs' RICO, SMLA, tortious interference with contract, breach of fiduciary duty, and civil conspiracy claims are **DISMISSED** as to all defendants.

The motion is **DENIED** as to Plaintiffs' breach of contract claims against all defendants.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Kevin Kevelighan, Esq.
Joseph J. Shannon III, Esq.
Timothy B. Meyers, Esq.
James W. McGarry, Esq.
Matthew J. Boettcher, Esq.
Dana M. Hathaway, Esq.
Lawrence C. Mann, Esq.